UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALBERT J. DEGUTIS, individually, and
on behalf of all others similarly situated,

      Plaintiff,

v.                                                            Case No:   2:12-cv-319-FtM-38DNF

FINANCIAL FREEDOM, LLC and
FINANCIAL FREEDOM
ACQUISITION, LLC,

      Defendants.

_____/

### ORDER[1]

     This matter comes before the Court on Defendants' Motion to Dismiss (Doc. #18)

filed on July 30, 2012[2]; Plaintiff's Response in Opposition to Defendants' Motion to

Dismiss (Doc. #36) filed on July 19, 2013; Reply in Support of Defendants' Motion to

Dismiss (Doc. #41) filed on August 6, 2013; and Plaintiff's Surreply in Opposition to

Motion to Dismiss (Doc. #45) filed on August 28, 2013.  The Motion is now ripe for

review.

_____

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

[2] This matter was administratively closed for a period of time pending a transfer decision by the Judicial Panel on Multidistrict Litigation after the filing of the instant Motion to Dismiss. (Doc. #22).  Transfer was ultimately denied.

## BACKGROUND

Plaintiff, Albert J. Degutis[3], initiated this action by filing a Class Action Complaint and Demand for Jury Trial against Financial Freedom, LLC and Financial Freedom Acquisition, LLC, on March 12, 2012, in the Twentieth Judicial Circuit in and for Lee County.  (Doc. #2).  Defendants timely removed the action to this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), on June 11, 2012.  (Doc. #1).

By way of background regarding the class allegations, the Complaint alleges that Plaintiff and other similarly situated homeowners in Florida who have or had Florida residential mortgage loans serviced by Financial Freedom, LLC between February 1, 2007 and the present, and owned by Financial Freedom Acquisition, LLC, were required to pay for "force-place" flood insurance policies.  (Doc. #2, ¶1).  Plaintiff alleges that Defendants engaged in a common pattern and practice of force placing flood insurance even though borrowers' property was already covered by an existing policy providing flood insurance.  (Id. at ¶1).  Plaintiff alleges that in the event that borrowers fail to maintain their flood insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, Defendants commonly choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" insurance policies.  Plaintiff maintains that such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates.  And further, that such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to

---

[3] Plaintiff's Complaint (Doc. #2) spells Plaintiff's name as "DeGutis," rather than "Degutis."  Both of the Parties in their briefing use both spellings.  The Court will use the spelling as indicated on Plaintiff's Mortgage, which is "Degutis."

collect premiums for time periods during which the mortgagor has no risk of loss.  (Id. at ¶2).  Even though these policies are typical, Plaintiff alleges that the mortgage contract does not disclose that the lender or other servicers will receive a commission or reinsurance premium from force-placed insurance providers for purchasing insurance from them.  The mortgage contract also does not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance.  Instead, the contract states to borrowers that the cost of the force-placed insurance is necessary to protect the lender's interest in the secured property.  (Id. at ¶15).

Plaintiff asserts that Defendants' unlawful actions include charging borrowers for unnecessary flood insurance policies, purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company without seeking competitive bids on the open market to maximize their own profits, backdating the force-placed policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies.  Plaintiff argues that these actions constitute a pattern of exploitative profiteering and self-dealing against the interest of the Plaintiff and Class Members.  (Id. at ¶4).

According to the Complaint, Albert J. Degutis obtained a reverse mortgage in the amount of $395,550 from Financial Freedom Senior Funding Corporation to purchase a condominium in 2006. (Doc. #2, ¶¶35-36).  The mortgage is now serviced by Defendant Financial Freedom and owned by Defendant Financial Freedom Acquisition.  (Id.).  Beginning in August 2010, Degutis claims that even though his condominium was insured under a master policy secured by his condominium association, which provided

3

flood coverage exceeding the unpaid principal balance on his mortgage, Defendants required him to obtain additional coverage. (Id. at ¶¶39, 45.). In a letter dated August 21, 2010, Defendants demanded that Plaintiff provide proof that his condo was covered by a flood insurance policy. (Id. at ¶41). On September 2, 2010, Plaintiff faxed to Defendants a copy of an insurance policy issued by Hartford Insurance Company of the Midwest, which Plaintiff alleges documented flood insurance coverage on Plaintiff's condo. (Id.). On September 7, 2010, Defendants demanded the Plaintiff provide proof that his property was covered by flood insurance. Defendants stated that Plaintiff was required to maintain coverage in the amount of the replacement cost or the maximum of $250,000. (Id. at ¶42). Defendants stated that unless its demands were met, it would force place a policy of insurance. (Id.). The amount it claimed Plaintiff would owe on this policy was the annual sum of $5,885.25 for a flood policy providing coverage of $250,000. (Id.).

In a letter dated October 5, 2010, Defendants stated that Plaintiff had 15 days to provide proof of insurance or it would force place a policy of flood insurance. (Id. at ¶43). On October 16, 2010, Plaintiff faxed a copy of the commercial building valuation report from his condo and a copy of the declarations page from the flood insurance policy which had been secured by his condo association providing flood coverage on the property. (Id.). Despite the receipt of this proof, Plaintiff alleges that Defendants insisted that Plaintiff secure an additional policy of flood insurance providing $50,000 more in coverage than the $3,745.69 which was provided by the condo policy. (Id. at ¶44). On October 20, 2010, Defendants claimed Plaintiff's condo was not adequately covered. In response, Plaintiff informed Defendants that the property, along with the

4

condominium, was insured for approximately $3,800,000 under a master policy, and even dividing the number of units in the condominium, 20, by the amount of the total insurance coverage, this amounted to an average of $190,000 per unit, which was more than enough owed by Plaintiff on the mortgage.  (Id. at ¶45).  Plaintiff stated also that more coverage would be obtained if the next insurance survey warranted an increase. (Id. at ¶45).  In a letter dated November 23, 2010, Defendants insisted in its demand for additional coverage of $50,000 and stated it would obtain a policy which provided this insurance at a charge of $258.13.  (Id. at ¶46).  Plaintiff responded to this demand by continuing to assert his position that insurance coverage on the property was sufficient. (Id.).

On December 2, 2010, Defendants acknowledged receipt of Plaintiff's correspondence in a letter stating:

Financial Freedom is in receipt of your correspondence regarding the hazard insurance for the above loan and we appreciate the opportunity to respond.

In response to your previous correspondence requesting information regarding the above referenced loan, please be advised that your loan servicing history is in the process of being researched. Once we have completed our research, we will provide you with a written response addressing each of your concerns.

We are committed to servicing our customers through a passion for superior customer service while cultivating a culture of trust, honesty and integrity. We will therefore do our best to resolve your concerns in a manner that is satisfactory to everyone involve.

There is no need for you to respond to this letter, unless you have not received a response from us within 60 business days from the date you sent your initial request.

Thank you for your correspondence in this matter. If you have questions, please contact our Customer Service Department, Monday through Friday, 7:00 a.m. to 5:30 p.m. (Pacific Time) at (866) 872-2904.

> For faster service, we invite you to contact us during our non-peak hours
> at 9:30 a.m. to 12:30 p.m. (Pacific Time), Monday through Friday.
>
> Sincerely,
> Insurance Department
> Financial Freedom Acquisition, LLC

(Id. at ¶47).

Seven months later, in a letter dated July 26, 2011, Defendants renewed its demand for additional flood insurance coverage.  On August 4, 2011, Plaintiff faxed to Defendants a copy of those portions of an insurance policy which demonstrated that the Hartford Insurance Company of the Midwest had issued a policy of insurance providing coverage for Plaintiff.  Among the documents sent to Defendants was a form titled "Flood Policy Declarations."  (Id. at ¶48).  On August 5, 2011, Defendants sent Plaintiff a letter wherein in stated that its records indicated that an existing flood policy with Hartford would expire on August 24, 2011, and it wanted proof that the policy would continue after that date with Hartford or some other insurance company.  (Id. at ¶49).

On August 16, 2011, Defendants sent a letter to Plaintiff informing him that he was required to purchase adequate flood insurance.  Defendants stated further that to maintain adequate insurance, it required that the Plaintiff's flood insurance coverage be in an amount at least equal to the lesser of (1) the last known amount of homeowners insurance that be had purchased or (2) the maximum coverage under The National Flood Insurance Program which it stated was $250,000.00 for residential properties in participating communities.  (Id. at ¶50).

In a letter dated September 13, 2011, Defendants demanded proof that adequate flood insurance was in force on his property.  Defendants stated further that unless it obtained such proof, it would pay "the insurance charges of $258.13 for the additional

flood insurance we place and will charge you for the insurance charge.  We will obtain additional flood insurance on your property in the amount of $50,000.00 effective on August 24, 2010 and expiring on August 24, 2011."  Additionally, Defendants stated it would charge Plaintiff a premium for a force-placed policy where the coverage, once secured, would have expired 20 days before Defendants' demand letter of September 13, 2011.  (Id. at ¶51).  On October 28, 2011, Defendants demanded that Plaintiff pay to it the sum of $258.13 for flood insurance coverage it had purchased for the coverage amount of $50,000.00.  Defendants stated that the coverage period for which Plaintiff was being charged the sum of $258.13 was for August 24, 2010 to August 24, 2011, a period of time which had passed more than two months before.  (Id. at ¶52).

On November 5, 2011, Plaintiff responded by summarizing his previous responses to Defendants' demands for proof of flood insurance coverage and a description of this information of what he had provided to Defendants.  (Id. at ¶53).  On November 7, 2011, Defendants stated that the flood insurance coverage was less than what they required and that Plaintiff must provide proof that the insurance policy which Plaintiff had obtained complied with its requirements.  (Id. at ¶54).

Degutis further alleges that on November 8, 2011, Financial Freedom sent him a letter purportedly requiring Degutis to obtain $33,400 in additional flood coverage, or Financial Freedom would place supplemental insurance on the property at a charge of $172.43.  (Id. at ¶55).  In a letter dated November 1, 2011,[4] Financial stated that it had

_____

[4] Although this is the date indicated in the Complaint, it is not clear that this is the correct date for this letter as it is a date prior to the Defendants' November 8, 2011 demand letter directing Plaintiff to obtain additional flood insurance.

force placed flood insurance coverage on Plaintiff's property in the amount of $250,000 under master policy 0668-5663.  (Id. at ¶56).

Plaintiff brings Count I for breach of the implied covenant of good faith and fair dealing; Count II for breach of contract; Count III for violation of the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"); and Count IV for unjust enrichment/disgorgement.

Defendants move to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  First, Defendants argue that Plaintiff's state law claims are preempted by federal law – the Homeowners' Loan Act ("HOLA") and its implementing regulations, which govern federally regulated savings associations like Financial Freedom, as well as by the National Flood Insurance Act ("NFIA").  See 12 C.F.R. § 560.2(b)(2).  Second, even if not preempted, Degutis' breach of contract claim fails as a matter of law because the relevant mortgage contract specifically authorizes Defendants to require insurance against hazards, including floods, in excess of the unpaid principal balance on the loan and up to the property's replacement value.  Third, Plaintiff argues that because Degutis has not and cannot articulate a claim for breach of contract, his claim for breach of the implied covenant also fails in that Florida law is well-settled that a breach of the implied covenant claim cannot be used to vary the express terms of the parties' contract.  Fourth, Degutis' claim under the FDUTPA must be dismissed, not only because the statute cannot be used to create liability for conduct that is expressly authorized, but also because it expressly excludes from its scope federally regulated savings associations.  Fifth, and finally, Defendant argues that

Plaintiff's unjust enrichment claim must be dismissed as a matter of law because Plaintiff admits the existence of an express contract between the Parties.

### DISCUSSION

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. Erickson v. Pardus, 551 U.S. 89 (2007); Christopher v. Harbury, 536 U.S. 403, 406 (2002).  "To survive dismissal, the complaint's allegations must plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)). The former rule -- that "[a] complaint should be dismissed only if it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief," La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004) -- has been retired by Twombly.  James River Ins. Co., 540 F.3d at 1274. Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). Alternatively, dismissal is warranted if, assuming the truth of the factual allegations of plaintiff's complaint, there is a dispositive legal issue which precludes relief.  Neitzke v. Williams, 490 U.S. 319, 326 (1989); Brown v. Crawford County, Ga., 960 F.2d 1002, 1009-10 (11th Cir. 1992).

Plaintiff states in his Complaint that he attached the Note and Mortgage at issue to his Complaint, see Doc. #2, ¶36; however, Defendants have informed the Court that

the service copy of the Complaint included no exhibits and there are no exhibits on file with the Court in which Plaintiff originally filed his Complaint and no such exhibits were included with the removal papers.  Defendants attached Degutis' Note and Mortgage to their Motion to Dismiss as Exhibits A and B.  Federal courts evaluating Rule 12(b)(6) motions may consider an exhibit "in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."  Financial Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007).  Thus, the Court has considered the Note and Mortgage in analyzing the issues herein.

### A. Preemption

Defendant first argues that Plaintiff's claims are preempted by the Home Owner's Loan Act, 12 U.S.C. § 1461, et seq. ("HOLA") and the National Flood Insurance Act ("NIFA").  The Supremacy Clause of our Constitution establishes that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." Arizona v. Untied States, 123 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012) (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)).  "In accordance with that principle, when state law conflicts with federal law, state law must give way." Guarino v. Wyeth, 719 F.3d 1245, 1248 (11th Cir. 2013) (citing Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1273-74 (11th Cir. 2013)). "Its most straightforward form, express preemption occurs when Congress 'enact[s] a statute containing an express preemption provision.'" Odebrecht, 715 F.3d at 1274

(citing Arizona, 123 S. Ct. at 2500).  The second – field preemption – precludes states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by exclusive governance."  Arizona, 123 S. Ct. at 2501. "The Supreme Court has instructed us that we may infer congressional intent to displace state law altogether 'from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Odebrecht, 715 F.3d at 1274 (internal quotation marks and alterations omitted) (citing Arizona, 123 S. Ct. at 2501).  Third, conflict preemption, arises in instances where "(1) compliance with both federal and state regulations is a physical impossibility, or (2) the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 939 (11th Cir. 2013) (internal quotation marks omitted).  The Court will first discuss the claims in the context of HOLA.

### 1.  Home Owner's Loan Act preemption

Most critical for purposes of this case is field preemption as Congressional intent to preempt state law is not expressly stated in HOLA.  "The HOLA, a product of the Great Depression of the 1930's, was intended to provide emergency relief with respect to home mortgage indebtedness at a time when as many as half of all home loans in the country were in default." Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 159, 102 S. Ct. 3014, 3025 (1982).  The HOLA empowers the Office of Thrift Supervision ("OTS"), "under such rules and regulations as [it] may prescribe – to

provide for the organization, incorporation, examination, operation, and regulation of ... Federal savings associations ..., giving primary consideration of the best practices of thrift institutions in the United States." 12 U.S.C. § 1464(a).  The HOLA authorizes the OTS to promulgate regulations "appropriate to carry out [its] responsibilities." 12 U.S.C. § 1463(a)(2). Pursuant to this authorization, the OTS regulates, *inter alia*, "the enforcement of laws, regulations, or conditions against such associations." 12 C.F.R. § 500.1(b).

Defendants argue that through HOLA, Congress granted the OTS plenary and exclusive authority to regulate all aspects of operations of Federal savings associations, and to preempt state laws affecting their operation.[5]  Indeed the OTS has issued a comprehensive set of regulations, part of which asserts field preemption of lending-related practices of federal associations:

> **Occupation of field**.  Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. § 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of HOLA. *To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public*

---

[5] Since the regulations discussed here were promulgated, the OTS has become part of the Office of the Comptroller of the Currency ("OCC") and its regulatory authority over federal savings banks has been transferred to the OCC, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). 12 U.S.C. § 5412. These regulations prior to the Dodd-Frank Act still apply to Plaintiff's claims, as the Dodd-Frank Act did not "alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency or the Director of the Office of Thrift Supervision regarding the applicability of State law under Federal banking law to any contract entered into on or before July 21, 2010" by a federal savings association or subsidiary thereof. 12 U.S.C. § 5553; Copeland-Turner v. Wells Fargo Bank, N.A., 800 F. Supp. 2d 1132, 1137-38 (D. Or. 2011); Settle v. World Sav. Bank, FSB, No. 11-00800, 2012 WL 1026103 (C.D. Cal. Jan. 11, 2012).  The contract in this case was entered into in 2006.  (Doc. #2, ¶35).

*free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling order or judicial decision.

12 C.F.R. §560.2(a) (emphasis added). Section 560.2(b) provides a list of "illustrative

examples" of types of state laws that are preempted, which include:

**Illustrative examples**. Except as provided in § 560.110 of this part, the types of state law preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

    (1)    Licensing, registration, filings, or reports by creditors;

    (2)    The ability of a credit to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

    (3)    Loan-to-value ratios;

    (4)    The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

    (5)    Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

    (6)    Escrow accounts, impound accounts, and similar accounts;

    (7)    Security property, including leaseholds;

    (8)    Access to and use of credit reports;

    (9)    Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in

credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

(10)   Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11)   Disbursements and repayments;

(12)   Usury and interest rate ceilings . . .; and

(13)   Due-on-sale clauses . . . .

Plaintiff argues that the Paragraph (c) exceptions save their claims.   Paragraph (c) states:

**State laws that are not preempted**.  State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

(1)   Contract and commercial law;

(2)   Real property law;

(3)   Homestead laws specified in 12 U.S.C. 1462a(f);

(4)   Tort law;

(5)   Criminal law; and

(6)   Any other law that OTS, upon review, finds:

(i)   Furthers a vital state interest; and

(ii)   Either has only incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

12 C.F.R. § 560.2(c).   Thus, HOLA does not preempt the listed state laws that only incidentally affect the lending operations of Federal savings associations.   The list of laws that are not preempted in subsection (c) is designed "to preserve the traditional

14

infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." "OTS Final Rule," 61 Fed. Reg. 50951, 50966 (Sept. 30, 1996).

"The Office of Thrift Supervision has exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to customers, and setting standards for processing and servicing mortgages." In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig., 491 F.3d 638, 643 (7th Cir. 2007). The OTS has no power to adjudicate disputes between customers and savings and loans, "[s]o it cannot provide a remedy to persons injured by wrongful acts of savings and loan associations, and furthermore HOLA creates no private right of action to sue to enforce the provisions of the statute or the OTS's regulations." Id. (citing Burns v. Int'l Inc. v. Western Sav. & Loan Ass'n, 978 F.2d 533, 535-37 (9th Cir. 1991)). "Against this background of limited remedial authority, we read subsection (c) to mean that OTS's assertion of plenary authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." Id.

It has been noted by other courts that have addressed the same issues as presented in this case that the regulations promulgated by Congress have created an analytical framework to determine whether a particular state law is preempted by HOLA. See Silverstein v. ING Bank, fsb, No. 12-10015, 2012 WL 4340587, at *2 (D. Mass. Sept. 21, 2012). Indeed, the OTS has set forth such a framework:

> When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph

(b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996). In light of this, the Court will examine Plaintiff's claims included in his Complaint in the context of the OTS's analytical framework. See In re Ocwen, 491 F.3d at 648 (In considering § 560.2(b) we must look to all "the acts alleged in the complaint.").

In clarification of Plaintiff's Complaint, Plaintiff asserts in his Response Brief that he is alleging that Defendants breached the contract at issue by charging Plaintiff costs beyond the legitimate fees for "necessary" coverage, in direct violation of the mortgage agreement. Plaintiff clarifies that he does not seek to curtail Defendants' ability to force place flood insurance, to charge consumers legitimate fees associated with that insurance, to compel Defendants to disclose legitimate fees, or to change any terms of credit in its agreements. Rather, Plaintiff has alleged that he was charged premiums for flood insurance that included costs beyond those necessary to protect Defendants' interest in the property and in excess of that required by law or his mortgage agreement. (Doc. #36, p. 8). Plaintiff also alleges that Defendants selected insurance providers according to exclusive, pre-arranged, surreptitious agreements whereby insurance policies were continually purchased from the same companies, rather than on the open market, which included costs that were not legitimately connected with loan servicing. These illegitimate costs included unearned "kickbacks" and "commissions" so that Defendants could continue to engage in this exclusive relationship, and impose

force-placed insurance policies upon consumers at prices that were far higher than the market rates for similar policies and which exceeded the legal and contractual requirements.   (Id. at pp. 8-9).   These same general allegations are included in Plaintiff's Complaint.

In essence, Plaintiff is alleging that Defendants may force place flood insurance pursuant to the mortgage contract, but he has a problem with the way that the Defendants are doing it in that Defendants' conduct violates the implied covenant of good faith and fair dealing contained in every contract (Count I), the explicit terms of the mortgage contract (Count II), and is an unfair business practice pursuant to the FDUTPA (Count III).

As a general argument against preemption of all Counts, Plaintiff argues that Defendants may not invoke HOLA preemption because Defendants are both subsidiaries of OneWest Bank, a federal savings association, and are loan servicers that did not engage in banking or lending activities with respect to Plaintiff's loan. Plaintiff's argument is not well taken.   The OTS regulations extend preemption under the federal banking laws to the non-bank operating subsidiaries of national banks and thrifts.   12 C.F.R. § 559.3(n)(1); Watters v. Wachovia Bank, N.A., 550 U.S. 1, 4 (2007).[6]

---

[6] The Dodd-Frank Act precludes the use of National Bank Act preemption to bar claims asserted against national bank subsidiaries, and changes the preemption standards under the HOLA to conform to those applicable to national banks. See 12 U.S.C. § 25b(h)(2); 12 C.F.R. § 34.6. Accordingly, HOLA preemption arguably does not extend to thrift subsidiaries post-Dodd Frank.   However, pre-Dodd Frank HOLA preemption analysis applies to claims in connection with Plaintiff's mortgage, since it was entered into with a subsidiary of a federal thrift before July 21, 2010. See Poindexter v. Wachovia Mortg. Corp., 851 F. Supp. 2d 121, 128 n.11 (D.D.C. 2012) ("[The Dodd-Frank preemption framework does] not apply to the current dispute because it involves a loan finalized in June 2007, over three years prior to Dodd-Frank."). See also supra note 5.

The Court will now address preemption as it applies to each Count in Plaintiff's Complaint.

### a. Counts I and II – breach of the implied covenant of good faith and fair dealing and breach of contract

Plaintiff's Complaint alleges that the mortgage contracts entered into by Plaintiff and the class members contained an implied covenant of good faith and fair dealing and that the contract was breached by the Defendants.  Plaintiff asserts that "[t]o the extent the mortgage contracts of Plaintiff and the Class members permitted Defendants to unilaterally "force-place" insurance, Defendants was (*sic*) obligated not to exercise their discretion to do so capriciously and in bad faith (for their own financial gain for the purposes of maximizing profits) at borrowers' expense."  (Doc. #2, ¶75).  Plaintiff claims that to the extent the mortgage contracts of Plaintiff and the Class permitted Defendants to unilaterally "force-place" insurance, Defendants were contractually permitted to do so only to the extent "reasonably necessary" to protect the mortgagee's interest in the secured property.  (Doc. #2, ¶81).  Plaintiff argues that Defendants have imposed or collected amounts that exceeded the amount necessary to protect the mortgagee's interest in the policy by force placing insurance in an amount that exceeded the principal balance of the loan.  Further, practices have without limitation included backdating force-placed policies, thus requiring borrowers to pay for retroactive coverage; and requiring customers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.  (Id. at ¶82).  Plaintiff has clarified that he is not challenging the Defendants' ability to force place flood insurance pursuant to the mortgage contract, but that he is alleging that Defendants breached the contract at

issue by charging Plaintiff costs beyond the legitimate fees for "necessary" coverage, in direct violation of the mortgage agreement.  These claims are essentially the same as those included under Count I.

Because Plaintiff is bringing a common law claim for breach of the implied covenant of good faith and fair dealing based upon the contract, the Court finds that Plaintiff's claims under Count I and II are not preempted as they are expressly exempted under 12 C.F.R. § 560.2(c).

### b. Count III – Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

In Count III, Plaintiff alleges violation of FDUTPA, listing a host of unfair, unlawful, and/or fraudulent business practices committed by the Defendants, all acts which appear to have been included in the previous two Counts.  See Doc. #2, ¶¶89(A)-(L).  Defendants argue that Plaintiff's FDUTPA claim is preempted because Plaintiff is seeking to impose affirmative disclosure requirements on Defendants in an area that is subject to federal regulations by the OTS.  Plaintiff respond that his FDUTPA claim is not preempted because consumer protection statutes, such as FDUTPA, which are intended to offer consumers protection from deceptive, fraudulent, or unfair business and debt collection practices, do not fall within HOLA's preemption reach.

The Florida Legislature enacted FDUTPA "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2). The Act declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts

or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Trade

or commerce" is defined as:

> [T]he advertising, soliciting, providing, offering, or distributing, whether by
> sale, rental, or otherwise, of any good or service, or any property, whether
> tangible or intangible, or any other article, commodity, or thing of value,
> wherever situated.  "Trade or commerce" shall include the conduct of any
> trade or commerce, however denominated, including any nonprofit or not-
> for-profit person or activity.

Fla. Stat. § 501.203(8).  "[F]ederal regulation of a field of commerce should not be

deemed preemptive of state regulatory power in the absence of persuasive reasons—

either that the nature of the regulated subject matter permits no other conclusion, or that

the Congress has unmistakably so ordained."  Fla. Lime & Avocado Growers, Inc. v.

Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 1217, 10 L. Ed. 2d 248 (1963).  The area of

consumer protection has traditionally been regulated by the states.  See Cliff v. Payco

Gen. Am. Credits, Inc., 363 F.3d 1113, 1125-26 (11th Cir. 2004).

Other courts that have examined the issue of whether HOLA preempts state

consumer protection statutes have found that as this is an area of law traditionally

regulated by the states, such that state laws are outside of the preemptive power of

HOLA, citing a 1996 opinion on the issue from the OTS Chief Counsel.  See In re

Ocwen; McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 557-58 (4th Cir.

2013); Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 578-79 (7th Cir. 2012).  As was

explained in "Preemption of State Laws Applicable to Credit Card Transactions" ¶ IIC

(Opinion of OTS Chief Counsel, Dec. 24, 1996, 1996 WL 767462):

> State laws prohibiting deceptive acts and practices in the course of
> commerce are not included in the illustrative list of preempted laws in §
> 560.2(b)....  The [Indiana] DAP [deceptive acts and practices] statute
> prohibits specified acts and representations in all consumer transactions
> without regard to whether the transaction involves an extension of credit.

Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.

The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions.... The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute-the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law.

Because Plaintiff is bringing a claim regarding deceptive acts and practices under the Florida statute, the Court finds that Plaintiff's claims under Count III are not preempted. They are expressly exempted under 12 C.F.R. § 560.2(c) as it encompasses commercial law and is vital to state interest only incidentally affecting lending operations, as discussed by the OTS above.

## 2. National Flood Insurance Act Preemption

Under the NFIA, a federally regulated lender cannot lend for the purchase of a condominium unit in a "special flood hazard" area unless the unit is covered by flood insurance "in an amount at least equal to" the lesser of "the outstanding principal balance of the loan or the maximum limit of coverage [ ] available under the [NFIA]," which for a condominium unit is $250,000. 42 U.S.C. §§ 4012a(b)(1), 4013(b)(2); 44 C.F.R. § 61.6(b); see Audler v. CBC Innovis Inc., 519 F.3d 239, 245 (5th Cir. 2008).

Under NFIA, regulated lenders and servicers must notify a borrower to obtain an appropriate amount of flood insurance if it is determined that a property is either not covered or the coverage does not meet the relevant statutory requirements. See 42 U.S.C. § 4012a(e)(1). The Act also provides that if the borrower fails to purchase such flood insurance within 45 days, the lender or servicer of the loan "shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of the premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance." See 42 U.S.C. § 4012a(e)(2). Section 4012a(f) of NFIA also provides for civil penalties that may be assessed "by the appropriate Federal entity for lending regulation" against regulated lending institutions that fail to comply. 42 U.S.C. § 4012a(b)(1).

With regard to NFIA preemption, Defendants argue that even in the absence of an express preemption provision, state law must yield to federal law where Congress has so occupied the field as to leave no room for state regulation or where the application of state law would stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Citing Crosby v. Nat'l Foreign Trade Council, 539 U.S. 363, 372 (2000).

While the Court agrees that Defendants are free to establish by contract a right to require that a borrower hold flood insurance coverage under the NFIA, Plaintiff is relying on allegations regarding the conduct of the Defendants in administering the policies, including the exchange of unearned kickbacks and commissions, and backdating flood insurance policies, rather than whether the Defendants could require and force place flood insurance on the property. The Court finds that allegations of such actions are not

those contemplated by the NFIA such that this action would not stand as an obstacle to the accomplishment and execution of the Act.   Thus, preemption under the NFIA is denied.

### B. Whether Plaintiff's Claims Independently Fail As A Matter of Law

Defendants next argue that Plaintiff's claims independently fail as a matter of Florida state law.  The Court will start by examining the breach of contract claim.

#### 1.  Count II – Breach of Contract

In reviewing the Complaint, Plaintiff claims under the breach of contract Count that Defendants breached the express terms of the force-placed insurance provision of the mortgage contract by imposing or collecting amounts that exceeded the amount necessary to protect the mortgagee's interest in the policy because the amount of total coverage was greater than the unpaid principal balance on the loan.  Defendants argue that Degutis' breach of contract claim fails because he can point to no specific provision of the mortgage Defendants purportedly breached; nor can he, because the terms of the mortgage contract expressly permit Defendants' alleged conduct and are required by federal regulation.   "The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach."  Rollins, Inc. v. Butland, 951 So.2d 860, 876 (Fla. 2d DCA 2006).

A breach of contract case involving the same covenant was recently at issue before the First Circuit Court of appeals, en banc.   See Kolbe v. BAC Home Loans Servicing, LP, No. 11-2030, 2013 WL 5394192 (11th Cir. Sept. 27, 2013).  That court's opinion has provided significant guidance regarding the interpretation of the covenant at issue in this case, which has been a cause for a split among courts throughout the

country.[7]   As this Court recognizes the strong need for uniformity of decision in the interpretation of this uniform contract provision, it finds the First Circuit's decision highly persuasive.

In this case, Degutis signed an Adjustable Rate Home Equity Conversion Mortgage for $395,500.  (Doc. #18-1).  While not specifically stated in the Complaint, the Mortgage appears to be guaranteed by the Federal Housing Administration ("FHA"), a part of the Department of Housing and Urban Development ("HUD") as the face of the document contains an FHA Case Number and the Mortgage contains Uniform Covenants required by the HUD-regulations to be in every FHA-insured mortgage.

The Mortgage requires Degutis to "pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender …."  (Doc. #18-1, ¶2.) The next paragraph, captioned "**Fire, Flood and Other Hazard Insurance**," is one of the provisions at issue in the instant case which Plaintiff claims Defendants breached:

> 3.     **Fire, Flood and Other Hazard Insurance**.  Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing

---

[7] As recognized by the First Circuit, the disputed provision appears in each of the nearly 7.8 million FHA-insured mortgages nationwide:

> Many class action lawsuits presenting precisely the same issue as this case have been filed in federal district courts throughout the country, producing a set of sharply conflicting district court opinions.  Moreover, this case bears on the intersection between two complex statutory and regulatory schemes: the FHA mortgage and insurance program means to promote home ownership, and the National Flood Insurance Program ("NFIP") meant to facilitate flood insurance.

Kolbe, 2013 WL 5394192, at *4, n.5.

and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

Id. at ¶3. This paragraph is a standard uniform covenant required by the FHA pursuant to federal law in order for federally-regulated lenders to make mortgage loans. See 24 C.F.R. § 203.17 (2012); "Requirements for Single Family Mortgage Instruments," 57 Fed. Reg. 27,596, 27,603-07 (June 29, 1989). Indeed, this paragraph, along with seventeen other paragraphs, is listed on Plaintiff's Mortgage under the heading, "UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:"

As discussed above, the HUD Secretary requires flood insurance coverage "in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvement, whichever is less" in areas designated by FEMA as having "special flood hazards." 24 C.F.R. § 203.16a; 24 C.F.R. § 203.45(c) (applying the flood insurance requirements of 24 C.F.R. § 203.16a to eligible home equity conversion mortgages like plaintiff's).[8] The maximum amount of NFIP insurance available for a single family home in a special flood hazard area is $250,000. See 42 U.S.C. §§ 4012a(b)(1), 4013(b)(2); 44 C.F.R. § 61.6(b). "Although the insurance is provided by private insurers to the extent possible, the United States supports the program by

---

[8] It is not stated in the Complaint whether Degutis' home is in an area designated by FEMA as having "special flood hazards," but again, the fact that the Mortgage includes such uniform covenants as required by FEMA, indicates to the Court that it is.

offering subsidy payments and reinsurance to the private insurers." Kolbe, 2013 WL 5394192 at *11 (citing 42 U.S.C. §§ 4054, 4055).

The Mortgage further provides that if Degutis does not maintain the required coverage, Defendants may purchase insurance sufficient to protect the value of the property:

> **5.** If Borrower fails to make … the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument … then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2. … Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

Doc. #18-1, at ¶5.[9]

Defendants argue that Plaintiff has failed to state a claim for breach of contract because Paragraphs 3 and 5 set forth above permit them to require insurance coverage in an amount exceeding the unpaid principal balance of the loan.   Specifically, Defendants argue that Paragraph 3 sets for the <u>minimum</u> amount of coverage that must be maintained, not the maximum, and that the lender has the discretion to require more insurance than the principal balance of the loan.   Plaintiff responds that Defendants' reading of the contract is gratuitously broad and, if applied, would allow Defendants unfettered discretion to set the amount of hazard insurance it requires the borrower to

---

[9] The Mortgage contains a Condominium Rider allowing for the use of condominium master insurance policies to satisfy the mortgagor's insurance requirements, but only to the extent they provide adequate coverage as required by the Mortgage: "Lender waives the provision in Paragraph 2 of this Security Instrument for the payment of the premium for hazard insurance on the property; and (ii) Borrower's obligation under Paragraph 3 of this Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy." (Doc. #18-1 at Rider ¶ A.)

carry on the property, without regard to the cost or type of insurance.  Plaintiff alleges that Defendants charged him costs beyond what was necessary to provide coverage. While the principal balance of the loan at the time that Defendants force placed flood insurance is not indicated in the Complaint, Plaintiff's Brief alleges that $190,000 was more than the amount owed on the mortgage.  (Doc. #36, n.2).  Thus, it is Plaintiff's position that the principal balance is some amount less than $190,000.  According to the Complaint, Defendants obtained additional flood insurance on his behalf in September 2011 and again in November 2011, wherein Defendant Financial stated in a letter to Plaintiff that it had force placed flood insurance coverage on Plaintiff's property in the amount of $250,000 under master policy 0668-5663.  (Id. at ¶¶52, 56).  This is an amount that Plaintiff argues was unnecessary as it exceeded the principal balance on the loan.

In 1968, pursuant to the NFIA, Congress authorized the National Flood Insurance Program, a federally subsidized effort to make flood insurance affordable on a nationwide basis to those in need of such protection. 42 U.S.C. § 4001(d)(1) (1988). FEMA administers the Program. Consequently, the Act authorizes the Director of FEMA to "provide by regulation for general terms and conditions of insurability" for eligible properties, after consulting with an advisory committee, as well as representatives of a pool of private insurers and state insurance authorities.  42 U.S.C. § 4013(a).  "The terms and conditions of policies issued under the Program are stated in the standard policy issued to each insured, and also appear in the Code of Federal Regulations as administrative regulations, subject to procedural requirements such as notice and

comment." Wright v. Director, Federal Emergency Mgmt. Agency, 913 F.2d 1566, 1569 (11th Cir. 1990).

In interpreting the contract provision at issue to determine how much flood insurance that a lender may force place pursuant to the uniform covenant, the First Circuit in Kolbe noted that when a contract uses uniform clauses such as this, "extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant." 2013 WL 5394192, at *5 (citing Sharon Steele Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048 (2d Cir. 1982)). See also Akanthos Capital Mgmt, LLC v. CompuCredit Holdings Corp., 677 F.3d 1286, 1298 (11th Cir. 2012) (quoting Sharon Steele Corp. and noting that standard provisions present in many contracts "must be given a consistent, uniform interpretation"). As this covenant is one required by the United States, "[t]his court therefore must examine the text of the Covenant in light of the purposes for which the United States imposed the language and the context of the relevant statutory scheme." Kolbe, 2013 WL 5394192 at *8.

The Parties in this matter do not dispute that Paragraph 3 of the Mortgage is a Uniform Covenant required by HUD for all FHA-insured mortgages, according to a regulation that went into effect after notice and comment. "Requirements for Single Family Mortgage Instruments," 57 Fed. Reg. 27,596, 27,603-07 (June 29, 1989). "In essence, HUD's regulation required that every FHA-insured mortgage contain a core of Uniform Covenants, while allowing the parties to an individual mortgage to add non-uniform covenants at the end of the contract." Kolbe, 2013 WL 5394192 at *6. Indeed, Degutis' mortgage contains both uniform and non-uniform covenants under specific headings.

In determining the uniform meaning of the uniform covenant that is at issue in this case, the First Circuit examined the text in light of its context and then looked to the United States' interpretation, which was on the case as amici.  The court found that the first two sentences of the covenant allow the lender to choose the amount of insurance for "any hazards," and that includes flood insurance because floods are hazards.  Id. at *8.  With regard to the third sentence, the court reasoned that:

> Although the third sentence also addresses flood insurance, it adds an *independent* requirement: that the borrower maintain *HUD's* minimum level of flood insurance in addition to the *lender's* minimum.  Because both HUD's and the lender's flood requirements are minimum requirements, they are perfectly consistent, and the borrower can meet both requirements by maintaining flood insurance in the amount of the higher requirement.

Id. at *9 (emphasis in original).  Looking to another uniform covenant also included in Degutis' Mortgage (at Paragraph 5), the court found that the "Bank's interpretation is also more consistent with another covenant of the contract, Covenant 7 . . . . This Covenant empowers the lender to purchase insurance to 'protect the value of the Property,' suggesting that the lender's economic interests are not limited to the principal balance of the loan."  Id. at *9.

The court went on to find that this interpretation is supported by the United States' position:

> Given this background and context, it is not surprising that the United States is able to confirm that HUD has 'never endorsed such a policy' of construing Covenant 4 as 'a federal *ceiling* for flood insurance coverage rather than a floor.'  The United States explains that Kolbe's reading conflicts with the overall structure of FHA mortgage insurance.  HUD's mortgage insurance program places the risk of flood and other hazard losses on the lender, *see* 24 C.F.R. § 203.379, and so gives the lender the authority to determine the amount of flood insurance necessary to protect its investment.

Id. at *11 (emphasis in original).  "Moreover, the United States has explained that the purpose of Covenant 4 is to allow individual lenders to make business judgments about how much flood insurance to require."  Id. at *16, n.23.  See also Wright, 913 F.2d at 1571 (noting that great deference must be accorded agency's interpretation of its own regulation).

Therefore, the Kolbe court determined that even though under the NFIP the HUD Secretary requires flood insurance coverage "in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvement, whichever is less" 24 C.F.R. § 203.16a, the lesser amount (somewhere south of $190,000 in Degutis' case) is not the ceiling at which the lender may require flood insurance.  Rather, this is in addition to the amount of insurance that may be required by the lender.

In this case, with the guidance of the Kolbe opinion, and a recognition of the need for uniformity of interpretation of the contract provisions at issue, the Court finds that Plaintiff has not asserted facts sufficient to allege breach of any terms of the mortgage contract.  The agreement entered into in this case consisted of an agreement under Paragraph 3 that Defendants may require flood insurance in the amount at least equal to the principal balance of the loan under the NFIP, which they did.  Defendants informed Plaintiff that he must carry this amount of flood insurance and corresponded with him regarding the coverage for nearly a year before they force placed flood insurance in an amount determined by the lender in their discretion in order to protect their interest in the property as allowed by Paragraphs 3 and 5.  Under Florida law,

where the contract "language is plain a court should not create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions." Key v. Allstate Ins. Co., 90 F.3d 1546, 1549 (11th Cir. 1996). See also Gibson v. Chase Home Finance, LLC, No. 8:11-cv-1302-T-23TBM, 2011 WL 6319401, at *3 (M.D. Fla. Dec. 16, 2011) (noting that a lender is free to establish by contract a right to require that a borrower hold a larger amount of flood insurance, exactly as the mortgage in this action allows) (citing Dept. of the Treasury, et. al, "Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers Regarding Flood Insurance," 74 Fed. Reg. 35914, 35936 (2009) ("Lenders are permitted to require more flood insurance coverage than required by the [NFIA].... Each lender has the responsibility ... to protect its ongoing interest in the collateral").[10] Thus, the breach of contract count is dismissed.

## 2. Count I – Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff asserts that "[t]o the extent the mortgage contracts of Plaintiff and the Class members permitted Defendants to unilaterally "force-place" insurance, Defendants was (sic) obligated not to exercise their discretion to do so capriciously and

---

[10] Lenders are also permitted by the regulations to backdate the insurance pursuant to 42 U.S.C. § 4012a(e)(2):

> If the borrower fails to purchase such flood insurance within 45 days after notification under paragraph (1), the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance, including premiums or fees incurred for coverage beginning on the date on which flood insurance coverage lapsed or did not provide a sufficient coverage amount.

In this case, according to Plaintiff's factual allegations, Defendants only backdated the coverage period to a date in 2010 when the Parties' correspondence regarding the flood insurance began (August 24, 2010-August 24, 2011), which was a time period in which Plaintiff's coverage was inadequate. (Doc. #2, ¶¶51-52).

in bad faith (for their own financial gain for the purposes of maximizing profits) at borrowers' expense."  (Doc. #2, ¶75).

Under Florida law, the implied covenant of good faith and fair dealing exists in virtually all contractual relationships.  Sepe v. City of Safety Harbor, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000); County of Brevard v. Miorelli Eng'g, Inc., 703 So.2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith.").  The implied covenant of good faith "is a gap filling default rule" which comes into play "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards."  Speedway SuperAmerica, LLC v. Tropic Enter., Inc., 966 So.2d 1, 3 n.2 (Fla. 2d DCA 2007).  See also Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1097 (Fla. 1st DCA 1999).  But, "[t]he Florida District Courts of Appeal have held unequivocally that the rights conferred by the implied covenant of good faith and fair dealing are limited.  The Florida appellate courts recently held that an action for breach of the implied covenant of good faith cannot be maintained in the absence of a breach of an express contract provision."  Burger King Corp. v. Weaver, 169 F.3d 1310, 1316 (11th Cir. 1999) (citing Hospital Corp of America v. Florida Med. Ctr., Inc., 710 So.2d 573, 575 (Fla. 4th DCA 1998)).  "With respect to [a] breach of an implied duty of good faith, a duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements."  Id. (internal citation omitted).  "Because Gibson fails to identify a breached contract term, the good faith and fair dealing claim, which requires a breach,

is untenable." Gibson, 2011 WL 6319401, at *5 (citing Centurion Air Cargo, Inc. v. United States Parcel Service, Co., 420 F.3d 1146, 1151-52 (11th Cir. 2005)).

In this case, as discussed above, the Court has found that Plaintiff has failed to state a claim that Defendants breached a term of the mortgage contract.  Thus, his breach of implied covenant of good faith and fair dealing also fails.

### 3.  Count III – Florida Deceptive Unfair Trade Practices Act

In Count III, Plaintiff alleges violation of FDUTPA, listing a host of unfair, unlawful, and/or fraudulent business practices committed by the Defendants, all acts which appear to have been included in the previous two Counts.  See Doc. #2, ¶¶89(A)-(L).[11]  The Florida Legislature enacted FDUTPA "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2). The Act declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  A claim for damages under FDUTPA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  City First Mortg. Corp. v. Barton, 988 So.2d 86 (Fla. 4th DCA 2008) (citation omitted).  See also KC Leisure, Inc. v. Haber, 972 So.2d 1069, 1073-74 (Fla. 5th DCA 2008).  A deceptive practice is one that is "likely to

---

[11] Defendants argue that the FDUTPA does not apply to thrifts organized under federal law, citing Fla. Stat. § 501.212(4)(c) ("This part does not apply to . . . [b]anks or savings and loan associations regulated by federal agencies.").  Defendant Financial Freedom is a division of OneWest Bank, FSB, a federally chartered thrift, and Defendant Financial Freedom Acquisition, LLC is OneWest's federally regulated subsidiary.  At least one Florida court has recognized that "[n]othing in FDUTPA suggests that bank subsidiaries, affiliates, or agents are necessarily exempt from FDUTPA." Bankers Trust Co. v. Basciano, 960 So.2d 773, 778 (Fla. 5th DCA 2007) (citing State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC, 946 So.2d 1253, 1257-58 (Fla. 1st DCA 2007)).

mislead" consumers.  Davis v. Powertel, Inc., 776 So.2d 971, 974 (Fla. 1st DCA 2000).

An unfair practice is "one that 'offends established public policy' and one that is

'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"

Samuels v. King Motor Co. of Fort Lauderdale, 782 So.2d 489, 499 (Fla. 4th DCA 2001)

(quoting Spiegel, Inc. v. Fed. Trade Comm'n, 540 F.2d 287, 293 (7th Cir. 1976)).  A

deceptive act occurs "if there is a representation, omission, or practice that is likely to

mislead the consumer acting reasonably in the circumstances, to the consumer's

detriment.  This standard requires a showing of probable, not possible, deception that is

likely to cause injury to a reasonable relying consumer."  Zlotnick v. Premier Sales Grp.,

Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (citation and quotations omitted).  The "safe

harbor" provision of the FDUTPA states that the Act "does not apply to an act or

practice required or specifically permitted by federal or state law."   Fla. Stat. §

501.212(1).

Defendants argue that this Count must be dismissed because it is premised on

conduct that is contractually authorized.  Defendants' argument is well taken, to an

extent.  Even though Defendants may force place flood insurance in an amount

determined to be necessary by the lender, Plaintiff has alleged that Defendants also

engaged in unfair business practices in doing so, such as failing to seek competitive

bids on the open market, failing to provide borrowers with an opportunity to opt out of

having force placed insurance policies provided by insurers with whom Defendants

have a commission arrangement, backdating policies, and receiving commissions and

kickbacks from an insurer which was not then passed on to the borrower.  As a result,

Plaintiff alleges that these acts and practices have caused Plaintiff harm in lost money

34

or property.  Given these allegations and taking them as true as the Court must at the Motion to Dismiss stage, the Plaintiff has stated a cause of action under FDUTPA. While the contract provisions at issue are entirely permissible under federal law, Plaintiff's allegations under this Count go beyond whether Defendants breached the contract.  In PNR, Inc. v. Beacon Property Management, Inc., 842 So.2d 773 (Fla. 2003), the Florida Supreme Court notes that "[a] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships."  Whether this claim is in fact tenable is a question for another day, perhaps asked in another motion, or of a jury.

4.  **Count IV – Unjust Enrichment**

Plaintiff brings Count IV under a theory of unjust enrichment, stating that Plaintiff and members of the Class have conferred a substantial benefit upon Defendants which has been appreciated by the Defendants by wrongfully collecting millions of dollars in purported commission payments and reinsurance premiums that derived from the force-placed insurance premiums paid by Plaintiff and the putative Class members.  (Doc. #2, ¶93).  Plaintiff seeks full disgorgement and restitution of Defendants' enrichment. Plaintiff asserts in his Brief that he brings the unjust enrichment claim in the alternative in the event his contract claim fails, which is allowed.  (Doc. #36, p. 19).

 "Florida courts have long recognized a cause of action for unjust enrichment 'to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity.'" State Farm Fire & Cas. Co. v. Silver Star Health and Rehab, No. 12-12181, 2013 WL 3989107, at *3 (11th Cir. Aug. 6, 2013) (quoting Butler v. Trizec Props., Inc., 524 So.2d

35

710, 711 (Fla. 2d DCA 1988)).  "Unjust enrichment cannot apply where an express contract exists which allows the recovery."  Atlantis Estate Acquisitions, Inc. v. DePierro, 2013 WL 1748642, at *4 (Fla. 4th DCA Apr. 24, 2013) (citing Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So.2d 696, 697 (Fla. 1st DCA 2008) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.")); Moynet v. Courtois, 8 So.3d 377, 379 (Fla. 3d DCA 2009) (same).  Unjust enrichment may only be pleaded in the alternative to a breach of contract claim where one of the parties asserts that the contract governing the dispute is invalid.  See Zarrella v. Pac. Life Ins. Co., 755 F. Supp. 2d 1218, 1227-28 (S.D. Fla. 2010) (citing In re Managed Care Litig., 185 F. Supp. 2d 1310, 1337-38 (S.D. Fla. 2002)).  The elements of a cause of action for unjust enrichment are: 1) plaintiff conferred a benefit on defendant; 2) defendant voluntarily accepted and retained the benefit; and 3) the circumstances are such that it would be inequitable for defendant to retain the benefit.  Hillman Construction Corp. v. Wainer, 636 So.2d 576 (Fla. 4th DCA 1994).  Upon a showing that an express contract exists, an unjust enrichment count will fail.  Williams v. Bear Stearns & Co., 725 So.2d 397, 400 (Fla. 5th DCA 1998).  See also State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc., 427 F. App'x 714, 722 (11th Cir. 2011); William Ryan Homes Fla., Inc. v. Whitney Nat'l Bank, No. 8:12-cv-1575-T-33TGW, 2012 WL 4328769, at *5 (M.D. Fla. Sept. 30, 2012) (finding that because "the parties do not contest (1) that a valid contract exists between William Ryan Homes and Whitney National Bank and (2) that the instant dispute arises out of this contractual relationship," the plaintiff could not also assert a claim for unjust enrichment).

In this case, it is undisputed by Plaintiff that an express mortgage contracts exists between Plaintiff and the Defendants.  Even though Plaintiff argues that it is alleging the unjust enrichment claim in the alternative, it is only alleged in the alternative to a breach of contract claim where the plaintiff is asserting that the contract at issue is invalid.  See Zarrella v. Pac. Life Ins. Co., 755 F. Supp. 2d 1218, 1227-28 (S.D. Fla. 2010).  Plaintiff is not alleging that the contract is invalid.  Indeed, Plaintiff has stated in the briefing that he does not allege that Defendants cannot force place flood insurance pursuant to the terms of the mortgage contract.  (Doc. #36, at p. 17).  Rather, Plaintiff is arguing that the insurance provision at issue in the mortgage contract vested Defendants with discretion to purchase an insurance policy on Plaintiff's behalf, which the Defendants exercised in bad faith.  (Doc. #44, p. 9).  But again, Plaintiff does not contest that there was a valid mortgage contract between the Parties.  Thus, Plaintiff's claim for unjust enrichment fails.

Therefore, Counts I, II, and IV will be dismissed with prejudice.  "The dismissal of a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), for example, unambiguously constitutes a ruling 'on the merits.'"  Borden v. Allen, 646 F.3d 785, 812 (11th Cir. 2011) (citing NAACP v. Hunt, 891 F.2d 1555, 1560 (11th Cir. 1990) ("the Supreme Court has clearly stated that '[t]he dismissal for failure to state a claim ... is a "judgment on the merits." ' " (quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 399 n.3, 101 S. Ct. 2424, 2428 n.3, 69 L.Ed.2d 103 (1981))).

Accordingly, it is now

**ORDERED:**

Defendants' Motion to Dismiss (Doc. #18) is **GRANTED in part and DENIED in part**.  Counts I, II, and IV are **DISMISSED with prejudice**.  The Motion is denied as to Count III.  Defendants shall file an answer to Count III within 21 days of the date of this Order.

**DONE** and **ORDERED** in Fort Myers, Florida this 18th day of October, 2013.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record